**MORRIS LAW OFFICE, P.C. Plaintiff,**

**v.**

**James Eddie TATUM, Ann Tatum, and TEE Engineering Co., Inc., Defendants,**

**No. 3:03 CV 00035.**

United States District Court, W.D. Virginia, Charlottesville Division.

Feb. 3, 2005.

Peter Booth Vaden, Peter Vaden, Attorney at Law, Walton Davis Morris, Jr., Charlottesville, VA, for Plaintiff.

James Eddie Tatum, Trinidad, CO, pro se.

Ann Tatum, Trinidad, CO, pro se.

David Brian Rubinstein, Fredericksburg, VA, Joe F. Childers, Law Offices of Joe F. Childers, Lexington, KY, for Defendants.

## MEMORANDUM OPINION

MICHAEL, Senior District Judge.

This action involves a dispute between the plaintiff and the defendants over an alleged breach of their contract for legal services. By order dated July 10, 2003, this case was referred to the presiding United States magistrate judge for proposed findings of fact and a recommended disposition. The magistrate judge filed a report and recommendation on September 2, 2004, recommending that a portion, specifically $8,732.15, of the interpled funds under Count I of the complaint be distributed immediately to the plaintiff, Morris Law Office (MLO). By order dated September 10, 2004, this court adopted the magistrate judge's report and recommendation and ordered that the $8,732.15 be distributed to the plaintiff together with a pro rata share of the accrued interest on those funds.

On November 10, 2004, the magistrate judge issued his second and final report and recommendation in regard to this case, recommending that the court: (1) grant the plaintiff's and defendant Tee Engineering's motions for summary judgment on Count I; (2) deny, in part, the plaintiff's motion for summary judgment with respect to Count II, to the extent it seeks recovery of attorney's fees under the contract, but grant the motion to the extent that it seeks recovery of unreimbursed expenses under the contract; and (3) grant the plaintiff's motion for summary judgment with respect to Count III, for attorney's fees under the theory of quantum meruit. After a thorough examination of the applicable law, the parties' supporting memoranda, the report and recommendation, and the plaintiff's objections thereto,[1]

---

1. The Tatums filed untimely objections to the magistrate judge's report and recommendation on December 16, 2004. MLO moved to strike those objections as untimely, and the court granted that motion for reasons explained in its January 11, 2005 order. Therefore, the court will not consider the Tatums' objections.

this court adopts the analysis and findings of the magistrate judge. This opinion will only address the plaintiff's objection and Tee Engineering's requests for prejudgment interest and attorney's fees.

## I. FACTUAL BACKGROUND

The magistrate's report gives a detailed explanation of the pertinent facts in this case, so the court will only recount briefly the facts related to the issues discussed below. After the mining activities of Basin Resources, Inc. caused subsidence damage to their Colorado home, the Tatums hired an experienced attorney, Walton D. Morris, Jr. of Morris Law Office (MLO), to help them with administrative and judicial proceedings against Basin. After he had completed some legal work for the Tatums on an hourly basis, the Tatums asked Morris to help them with additional administrative and possible judicial proceedings against Basin. Morris drafted a contract to govern the remainder of his representation of the Tatums. After some discussion and negotiation, the Contract was executed on January 24, 2001.

The Contract provided, among other things, that the Tatums would pay MLO a contingency fee for its work, based on a graduated schedule depending upon which stage of the proceedings money was recovered. (Para.2.0.) It also stated that the Tatums would reimburse MLO for "all of [its] reasonable expenses incurred in connection with the work performed under this contract" within thirty days of billing. (Para.3.0). The contract provided, in paragraph 2.1(b), that if the Tatums terminated the contract prior to final judgment, then the Tatums would be immediately obligated to pay Morris a "partial attorney fee" of $250 per hour for his services and $50 per hour for paralegal assistance. This "conversion clause" also provided that "[t]he balance of Morris' total attorney fee shall be determined in accordance with [the contingency fee section] of this contract." Fi-

nally, paragraph 4.0 preserved the Tatums' right to terminate the contract: "unilaterally at any time, for any reasons or for no reason," subject to the terms of paragraph 2.1(b). The contract provides that it shall be interpreted in accordance with Virginia law.

After the Tatums had received a settlement offer from Basin to cover the costs of the administrative proceeding, and after MLO had helped the Tatums secure a $622,000 judgement in a Colorado state trial court, the Tatums discharged MLO partly because of a dispute about unpaid bills of an expert witness, Tee Engineering (Tee). Because Basin has appealed the judgment of the trial court, the litigation is not yet final. MLO brought this action against the Tatums in federal court to recover its attorney's fees and expenses, including those owed to the expert witness.

## II. THE PLAINTIFF'S OBJECTION REGARDING COUNT II

 Under Count II of the complaint, the plaintiff alleges that the Tatums breached paragraph 2.1(b) of the Contract by failing to pay it "partial attorney's fees" after discharging Morris prior to final judgment in the Colorado litigation. These fees totaled $151,312.50 plus prejudgment interest. The plaintiff also alleges that the Tatums breached paragraph 3.0 of the Contract by refusing to reimburse MLO for nominal out-of-pocket expenses incurred during the Colorado litigation, namely $1,213.44, plus prejudgment interest.

The magistrate judge found that paragraph 2.1(b), the "conversion clause," of the contract, was unenforceable under Virginia law, as articulated in *Heinzman v. Fine*, 217 Va. 958, 234 S.E.2d 282 (1977). In *Heinzman*, an attorney was terminated, without just cause, by the client in the middle of the representation, but the attor-

ney still wanted to recover his contingency fee that he negotiated in their initial contract, even though the settlement was negotiated by a successor attorney. The court held that a client's right to discharge his attorney is compromised if he is liable for a contingency fee to both his former and current attorneys; therefore, the former attorney should only be able to recover his fee in quantum meruit. *Id.* at 964, 234 S.E.2d 282. Here, the magistrate judge found that the conversion clause in MLO's contract was unenforceable because it stated that, if discharged before final judgment, the Tatums would be liable to MLO for both his hourly fee and for a portion of his contingency fee. Even though MLO was not attempting to recover his contingency fee, the magistrate judge found that the clause of the contract was unenforceable under *Heinzman* and Virginia ethics rules. Therefore, MLO could not recover his hourly fee based on that section of the contract. Instead, MLO was only entitled to recover his attorney's fees on a quantum meruit basis.

MLO does not object to the magistrate judge's conclusion that the portion of paragraph 2.1(b) which provides for an additional fee based on the contract's contingent fee calculus is unenforceable. But MLO does object to the magistrate judge's report to the extent that the report does not sever the unenforceable part of the contract from the remainder of paragraph 2.1(b). MLO argues that paragraph 2.1(b) can be enforced against the Tatums to the extent that it provides that MLO is due his hourly fee in the event of early termination. MLO states that only one sentence needs to be deleted, namely that which states: "The balance of Morris' total attorney fee shall be determined in accordance with subsection 2.0 of this contract."

The court finds, however, that this sentence in the contract cannot be severed from the contractual provision which MLO seeks to enforce in Count II. "Generally, when a contract covers several subjects, some of whose provisions are valid and some void, those which are valid will be upheld if they are not so interwoven with those illegal as to make divisibility impossible." *Alston Studios, Inc. v. Lloyd,* 492 F.2d 279, 285 (4th Cir.1974) (*citing Bristol v. Dominion National Bank,* 153 Va. 71, 149 S.E. 632 (1929)). In this case, paragraph 2.1(b) represents a single indivisible "provision" of the contract. The paragraph describes how the "partial attorney's fee" will be computed hourly, and the "balance of Morris' total attorney fee" shall be computed according to a contingency basis. These two sentences are related and interwoven, and cannot be divided or construed independently.

Moreover, simply deleting the objectionable sentence in paragraph 2.1(b) would constitute "blue penciling," which is impermissible under Virginia law. "The difference between 'blue penciling' and severing is a matter of focus. The former emphasizes deleting, and in some jurisdictions adding words in a particular clause. The latter emphasizes construing independent clauses independently." *Roto–Die Co., Inc. v. Lesser,* 899 F.Supp. 1515, 1523 (W.D.Va.1995) (refusing to interpret Virginia law as permitting blue penciling); *see also Pitchford v. Oakwood Mobile Homes, Inc.,* 124 F.Supp.2d 958, 966 (W.D.Va.2000) (same). In addition, because the paragraph refers to a "partial attorney's fee," which MLO concedes is the total attorney's fee to which he is entitled, the word "partial" would have to be deleted from several sentences in the paragraph in order for the clause to make sense. This is exactly the kind of "blue penciling" that is prohibited under Virginia law. The court will not rewrite this contractual provision for the parties so that it will be enforce-

able. Therefore, all of paragraph 2.1(b) of the Contract must be held to be void.[2]

For the above reasons, the court OVER-RULES the plaintiff's objection to the magistrate judge's report and recommendation.

### III. Tee's Request for Prejudgment Interest and Attorney's Fees

■ In its motion for summary judgment, Tee Engineering requests an award of $19,185.00 plus prejudgment interest, as well as its costs and attorney's fees incurred in prosecuting its counterclaim.

■ The magistrate judge recommended that this court exercise its discretion to award prejudgment interest to run from a date selected by the court until the date of the court's judgment. The court agrees that this is an appropriate case for prejudgment interest, and finds that interest should run from the date on which Tee's final bill was due. Tee sent its final invoice to Morris on December 17, 2002. The Tatums must have received a copy of this invoice by December 24, 2002 because that is the date on which Morris filed their Bill of Costs, which included Tee's bill as an exhibit, with the Colorado Court. Under MLO's Contract, the Tatums were obligated to reimburse MLO for expenses, including for the cost of experts, within thirty days of the date on which Morris billed them. At the latest, the Tatums were notified of Tee's final bill on December 24, 2002, and so payment on that bill was due on January 24, 2003. Therefore, prejudgement interest should run from January 25, 2003 to the date of this judgment. The prejudgment interest rate due to Tee is that prescribed by the laws of Virginia—six percent. *See* Va.Code Ann. § 6.1–330.54 & § 8.01–382 (2004) (setting

six percent interest rate); *United States v. Dollar Rent A Car Systems, Inc.*, 712 F.2d 938, 941 (4th Cir.1983) (federal courts who use their discretion to award prejudgment interest in diversity cases should apply the interest rate of the forum state).

In his report, the magistrate judge recommended that Tee receive a pro rata share of the interest that has accrued on its award since its deposit with the court, however, the magistrate did not consider that awarding Tee both its pro rata interest and prejudgment interest would be duplicative. Therefore, this court finds that Tee shall only receive prejudgment interest at a rate of six percent, but that Tee shall not also receive the pro rata share of interest that has accrued on the funds that have been held in the registry of the court.

Finally, in its motion for summary judgment, Tee requests an award of costs and attorney's fees incurred in prosecuting its counterclaim. However, Tee makes no legal arguments in its motion to support this request. Therefore, the court sees no reason not to apply the American rule requiring each party to bear his own costs and attorney's fees. *See Buckhannon Bd. & Care Home v. W. Va. Dep't of Health & Human Res.*, 532 U.S. 598, 602, 121 S.Ct. 1835, 149 L.Ed.2d 855 (2001) (Courts usually follow the "American Rule," absent explicit statutory authority to the contrary.) Tee's request for attorney's fees and costs must be denied.

### IV. Conclusion

The court has reviewed all other parts of the magistrate judge's report and recommendation and has found no clear error. Therefore, the court will adopt the report

---

**2.** Note that the court only finds that paragraph 2.1(b) of the contract is void, but agrees with the magistrate judge that other separate provisions in the contract are enforceable.

Essentially, paragraph 2.1(b) can be severed from the remainder of the contract. Therefore, MLO is still entitled to recover its expenses under paragraph 3.0 of the contract.

and recommendation of the magistrate judge, as amended by this opinion. An appropriate order this day shall issue.

The Clerk of the Court hereby is directed to send a certified copy of this Memorandum Opinion to all counsel of record and to Magistrate Judge Crigler.

### FINAL ORDER

For the reasons stated in the accompanying Memorandum Opinion, it is this day

### ADJUDGED, ORDERED, AND DECREED

as follows:

1. The plaintiff's objection to the Report and Recommendation, filed November 15, 2004, shall be, and hereby is, OVERRULED.

2. The magistrate judge's Report and Recommendation, filed November 10, 2004, shall be, and it hereby is, ADOPTED.

*Count I:*

3. The plaintiff's and Tee Engineering's motions for summary judgment on Count I, shall be, and hereby are, GRANTED, to the extent that they seek distribution to Tee Engineering of $19,185.00 of the interpled funds together with prejudgment interest at an annual rate of 6% from January 25, 2003 until the date of this judgment.

4. The court hereby DIRECTS the Clerk to distribute $19,185.00 of the funds now held in the Court's registry to Tee Engineering, together with prejudgment interest at an annual rate of 6% from January 25, 2003 until the date of this judgment.

5. Tee Engineering's motion for summary judgment hereby is DENIED to the extent that it seeks attorney's fees and costs for prosecuting its counterclaim.

*Count II:*

6. The plaintiff's motion for summary judgment on Count II is DENIED to the extent that it seeks an award of attorney's fees owed to MLO under the parties' contract, but GRANTED to the extent that it seeks unpaid expenses from the Colorado litigation under the contract.

7. The Tatums' motion for summary judgment is GRANTED with respect to the enforceability of paragraph 2.1(b) of the contract, but DENIED with respect to plaintiff's claim in Count II for reimbursement of expenses under paragraph 3.0 of the contract.

8. MLO hereby shall have and recover judgment against James Eddie Tatum and Ann Tatum, jointly and severally, for unpaid expenses under Count II, in the amount of $1,213.44 plus 6% prejudgment interest to run from the date of MLO's termination of employment, February 4, 2003,[1] until the date of this judgment. This judgment under Count II for unpaid expenses and prejudgment interest is to be paid first out of any funds that remain in the registry of the court,[2] and then according to law, with the total not to exceed $1,213.44 plus prejudgment interest.

*Count III:*

9. The court hereby GRANTS the plaintiff's motion for summary judgment on Count III, for quantum meruit relief,

[1] On February 4, 2003, the Tatums filed a motion with the Colorado state court to allow Morris to withdraw as their attorney. The motion indicated that Morris "is not to represent Ann and Jim Tatum in anyway and he is released from any obligation to do any further work in this case." Exh. 87, First Declaration of Morris in Support of Plaintiff's Motion for Summary Judgment. The court considers this date MLO's date of termination.

[2] The Clerk should first distribute from the court's registry $19,185 plus prejudgment interest to Tee Engineering, and then distribute any remaining funds as specified in paragraph 8 above.

and the Tatums' motion for summary judgment on this count is DENIED.

10. MLO hereby shall have and recover judgment against James Eddie Tatum and Ann Tatum, jointly and severally, in the amount of $151,312.50 for unpaid attorney's fees, plus prejudgment interest at an annual rate of 6% from the date that MLO was terminated, February 4, 2003, until the date of this judgment.

11. The above-captioned civil action shall be STRICKEN from the active docket of the court.

The Clerk of the Court hereby is directed to send a certified copy of this Order and the accompanying Memorandum Opinion to Magistrate Judge Crigler and to all counsel of record.

*REPORT AND RECOMMENDATION*

CRIGLER, United States Magistrate Judge.

Before the court are the parties July 12, 2004 cross motions for summary judgment on all three counts of plaintiff's Complaint. The motions have been referred to the undersigned under the authority of 28 U.S.C. § 636(b)(1)(B) to render to the presiding District Judge a report setting forth findings, conclusions, and recommendations for their disposition.[1] At the request of plaintiff, Morris Law Office ("MLO"), and without opposition from the defendants, the undersigned previously issued a Report and Recommendation on plaintiff's motion for immediate distribution of $8,732.15 of the interpleaded funds along with a *pro rata* share of net interest accrued on the funds while in the registry of the court. The Report and Recommendation has been adopted by the presiding District Judge, and those funds, together with interest, have been distributed to the plaintiff.[2] This Report and Recommendation separately addresses questions concerning the distribution of the remaining interpled funds, $20,253.35, together with accrued interest, on the one hand, and, on the other, the interrelated claims for attorney fees and expenses alternatively set forth in COUNT II (breach of contract) and in COUNT III (*quantum meruit*) of the Complaint.

For the reasons set forth below, the undersigned will RECOMMEND that the presiding District Judge enter an order GRANTING plaintiff's and TEE Engineering's motions for summary judgment on COUNT I, the interpleader count, and distributing all remaining funds in the registry of the Court as set forth below; DENYING, in part, plaintiff's motion for summary judgment with respect to COUNT II of the Complaint to the extent it seeks to recover attorney's fees under the Contract, but GRANTING the motion to the extent plaintiff seeks recovery of unreimbursed expenses under the Contract; GRANTING plaintiff's motion for summary judgment and ENTERING judgment in favor of the plaintiff and against the defendants with respect to COUNT III, for *quantum meruit*; and, correspondingly, GRANTING, in part, defendants' motion for judgment on the pleadings/ motion for summary judgment with respect to COUNT II and DENYING their motion in all other respects.

---

1. None of the parties to this action requested a trial by jury. In the event there are genuine issues of material fact, the case is to be tried before the presiding District Judge essentially on the same evidence developed during discovery.

2. This action renders moot the contentions by the Tatums that MLO is not entitled to assert a claim under the Contract for legal services performed in the administrative proceedings against the funds held under COUNT I, the interpleader. With those contentions, so goes the factual denial that they and MLO had negotiated MLO's entitlement to those fees.

## PROCEDURAL HISTORY

Plaintiff instituted this action both to interplead certain funds which were in its possession and over which there was a dispute concerning distribution and to recover from the defendants attorney's fees and out-of-pocket expenses, including expert witness fees, arising from alleged multiple breaches of a Contract for Legal Services ("the Contract") executed by Morris Law Office, by and through its principal attorney, Walton D. Morris Jr. (respectively "MLO" and "Morris"), and James Eddie Tatum and Ann Tatum ("Jim Tatum;" "Ann Tatum;" or "the Tatums") on January 24, 2001. The Contract set forth the terms by which MLO was to continue representing the Tatums in a dispute which had arisen in Colorado concerning subsidence damage to their ranch home, known as Solitario. Among other things, the Contract fixed a graduated schedule for contingency fees in ¶ 2.0 and provided for the reimbursement of costs and expenses within thirty (30) days of billing in ¶ 3.0. It also set forth an alternative arrangement for compensation to MLO in the event of terminations of the relationship. Upon "the Tatum's termination of this contract prior to any final judgment," the Contract obligated the Tatums to pay MLO a "partial attorney fee" at his regular rate of $250 per hour for all his services preceding termination and $50 per hour for paralegal assistance. Contract ¶ 2.1(b). This so called "conversion clause" further provided that "[t]he balance of Morris' total attorney's fees shall be determined in accordance with [the contingency fees subsection] of this contract." Section 4, ¶ 4.0 of the Contract explicitly preserved the Tatums' right to terminate MLO "unilaterally at any time, for any reason or for no reason," subject, however,

to the terms of ¶ 2.1(b). Finally, the Contract revealed that it was the complete agreement of the parties, and that its interpretation would be governed by Virginia law. Contract ¶¶ 5.0 and 5.2.

In COUNT I of the Complaint, plaintiff alleges that the Tatums breached ¶ 3.0 of the Contract by failing to timely reimburse it for expert witness fees charged by TEE Engineering Inc. ("TEE Engineering" or "TEE") relating to and supporting the Tatums' claims in a Colorado civil action. Plaintiff claims that, under ¶ 3.0 of the Contract, TEE is entitled to $19,185.00, plus appropriate prejudgment interest, out of the remaining $20,253.35 interpleaded and deposited in the registry of this court for expert services rendered on behalf of the Tatums in the Colorado litigation. As the Tatums' obligations to TEE, if any, run through MLO, plaintiff asks this court to award TEE's expert fees so that they, in turn, may be distributed according to the parties' agreement for the payment of expert fees incurred in the Colorado case. The Tatums, on the other hand, contend that MLO and TEE have no right to the disputed interpleaded funds, and that the balance held in the registry of the court belongs to them.

In COUNT II of the Complaint, plaintiff alleges, first, that the Tatums breached ¶ 2.1(b) of the Contract by failing to pay MLO "partial attorney's fees" after terminating Morris' legal services prior to final judgment in the Colorado litigation, and, second, that the Tatums breached ¶ 3.0 of the Contract by failing to compensate MLO for nominal out-of-pocket expenses incurred during the Colorado litigation. Plaintiff seeks a total of $152,525.94, comprised of $151,312.50 in attorney's fees and $1,213.44 in out-of-pocket expenses,[3] as well as prejudgment interest on the same.

---

**3.** Plaintiff originally demanded $152,597.46, including $1,284.96 in relief for unpaid out-of-pocket expenses under ¶ 3.0 of the Contract. However, the undersigned is of the view that only $1,213.44 of that can be substantiated.

In COUNT III of the Complaint, plaintiff asserts an alternative claim in *quantum meruit* for the same fees and expenses sought in COUNT II, together with prejudgment interest. The facts underlying this claim are identical to those asserted under COUNT II, though the Tatums have raised equitable defenses that somewhat broaden the factual considerations.

Jurisdiction of the court is founded upon diversity of citizenship, 28 U.S.C. § 1332, and the authority of the court over plaintiff's interpleader claim set forth in Count I is founded upon 28 U.S.C. § 1335. Under *Erie Railroad Company v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938) and *Klaxon Company v. Stentor Electric Manufacturing Co., Inc.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), the case should be decided under the substantive law and/or choice-of-law rules of the Commonwealth of Virginia.

## FACTUAL BACKGROUND

### The Contract

After suffering extensive subsidence damage to their Colorado ranch as a result of the nearby mining activities of Basin Resources, Inc. ("Basin"), the Tatums sought out Walton D. Morris, Jr., Esq. of MLO, an attorney licensed in Virginia, for his specialized expertise in handling complex mining litigation and, as a result, hired MLO to represent them. First Declaration of Walton D. Morris, Jr., in Support of Plaintiff's Motion for Summary Judgment ("Morris Decl.") ¶ 17; Deposition of Ann Tatum ("Dep. of Ann Tatum") at 9. Initially, the Tatums retained MLO on a non-contingent, hourly fee basis at $250 per hour to prosecute an administrative action before the Colorado Interior Board of Land Appeals ("Board") aimed at enforcing the Board's prior order directing the federal Office of Surface Mining Reclamation and Enforcement to inspect the Tatums' property and to take appropriate action against Basin. Decl. of Morris ¶ 17–18. As a consequence of Morris' representation, that action was resolved in favor of the Tatums. Morris Decl. ¶ 20–22.

Some months later, the Tatums again retained MLO on an hourly fee basis of $250.00 per hour to enter into settlement negotiations with Basin to resolve the issue of damages without recourse to litigation. Morris Decl. ¶ 23. Prior to engaging MLO this second time, Ann Tatum filed a citizen's request for inspection and enforcement with the Colorado Division of Minerals and Geology ("Division of Minerals"). Morris Decl. ¶ 24. When the Division of Minerals issued a notice of violation directing Basin to repair or replace the damaged structures on the Tatums' property, Basin appealed. Morris Decl. ¶ 25–27. Meanwhile, MLO's negotiations with Basin concerning these issues reached an impasse, compelling the Tatums to pursue a remedy through the Colorado courts. Morris Decl. ¶ 28. However, the Tatums did not concede Basin's challenge to the administrative notice. Rather, they asked MLO to represent them in the administrative proceedings as well as in a civil action against Basin for damages. Morris Decl. ¶ 28. In view of this, MLO drafted the Contract to govern the remainder of his representation of the Tatums and forwarded the draft to the Tatums for review. Morris Decl. ¶ 34

The parties dispute some of the details relating to the negotiations which took place prior to the execution of the Contract, especially with respect to the termination provision at issue in this case. Morris Decl. ¶ 35–44; Deposition of James Eddie Tatum ("Dep. of Jim Tatum") at 100. It is not contested, however, that the Contract was executed on January 24, 2001, that its terms, in pertinent part, are those the undersigned recited above, and that those terms represent the final agree-

ment of the parties. Dep. of Jim Tatum at 100, 103.

## COUNT I

On March 20, 2001, MLO filed a civil action on behalf of the Tatums against Basin in the Colorado state court seeking $622,000 in damages, together with pre-judgment interest and costs. Morris Decl. ¶ 89. At the same time, MLO continued to manage the administrative proceedings, which, by July of 2001, had blossomed into a complex and multifaceted engagement before the District Court of Las Animas County, Colorado involving both the state's Division of Minerals and the Board. Morris Decl. ¶ 45–50.

During the rest of 2001, and nearly all of 2002, the civil and administrative actions progressed in tandem. To buttress its claim for damages against Basin, MLO hired a number of experts in the fields of engineering and geology to testify to the nature, extent, and causes of the subsidence damage. Morris Decl. ¶ 109. One such expert was Don F. Blackburn ("Blackburn") of TEE Engineering. Morris Decl. ¶ 112.

Over the course of the proceedings, Blackburn, acting at the direction of MLO and with the imprimatur of the Tatums, performed numerous tasks as an expert witness, for which he promptly billed MLO. MLO, in turn, billed the Tatums, under ¶ 3.0 of the Contract seeking reimbursement of these expenses. Morris Decl. ¶ 113. On three occasions-August, 30, 2002; November 10, 2002; and December 12, 2002-the Tatums, issued drafts payable to MLO, for partial payment of fees billed by TEE. Morris Decl. ¶ 115, 116, 121; Dep. of Jim Tatum at 269–271; *Id.* at Exhibit 59. These partial payments totaled $11,868. *Id.*

On December 17, 2002, the Colorado District Court entered a judgement in the civil action against Basin in favor of the Tatums in the amount of $622,000, the full amount they had demanded. TEE then submitted a final bill to MLO, which MLO forwarded to the Tatums, for expert witness services in the amount of $31,553.00, of which $19,185.00 remains unpaid. Morris Decl. ¶ 98, 124. When the Tatums failed to provide even partial payment of TEE's final bill within thirty (30) days, MLO considered them to be delinquent under ¶ 3.0 of the Contract. Morris Decl. ¶ 125. By that time, MLO and the Tatums had negotiated a settlement of all issues in the administrative proceedings for $30,000.00, which was made payable to MLO as attorney for the Tatums. With an eye toward discharging the obligations to TEE, Morris asked that the Tatums allow him to disburse $19,185.00 of the funds to TEE. The Tatums refused. Morris Decl. ¶ 78–80.

Aware that he was not permitted to retain the $30,000, and in a quandary about how it should be distributed, Morris sought and received an informal ethics opinion from the Virginia State Bar (VSB) on the issue. Morris Decl. ¶ 127. Pursuant to the suggestion of the VSB ethics counselor, Morris disbursed to the Tatums the undisputed portion of the funds, namely $976.50, placed the remaining disputed funds in a trust account, and requested again that the Tatums authorize him to pay TEE's final bill out of those funds. Morris Decl. ¶ 127–128. The Tatums denied that request and threatened to terminate MLO's employment should Morris not release the entire amount of the disputed funds to them by noon the following day. Morris Decl. ¶ 129. When Morris declined to honor this demand, the Tatums discharged MLO.[4] Morris Decl. ¶ 130–133.

---

4. The parties contest the reasons underlying the deterioration of MLO's relationship with the Tatums and the Tatums final termination of MLO's employment. The Tatums charge, among other things, that MLO lied to them repeatedly, acted extremely erratically in the

MLO then sought mediation of the dispute, but when an agreed resolution was not forthcoming, he instituted this action and interpleaded the funds into the registry of the court. Morris Decl. ¶ 135. *Id.*

## COUNTS II and III

COUNT II and III arise as the result of the Tatums' termination of MLO services after the Tatums prevailed at trial on all questions of liability and damages against Basin in the amount of $622,000.00, and after a bill of costs was submitted to the trial court, seeking an award of costs and statutory attorney's fees, but prior to the court's taking action on that post-judgment pleading. The Bill of Costs, which was reviewed and approved by the Tatums before its was presented to the court by Morris, sought to recover from Basin what was offered as MLO's reasonable attorney's fees, calculated at an hourly rate under Colorado's fee-shifting statutes, together with all costs and expenses associ-

ated with prosecuting the action, including the full amount of fees charged by TEE Engineering.[5] Memorandum in Support of Plaintiff's Motion for Summary Judgment ("Plaintiff's Memorandum"), Exhibit 30, Bill of Costs.[6] It is not disputed in this case that, under the Contract, the Tatums retained the right to terminate MLO at any time during the litigation, for any reason or no reason. Contract for Legal Services ¶ 4.0. The dispute here centers on the extent to which that event triggered the Tatums' obligations to MLO for attorney's fees and costs. Despite the fact that some of the facts concerning MLO's discharge are either in dispute or are unclear, it cannot be disputed that, in the wake of MLO's discharge, the Tatums refused to compensate MLO for any of the professional services claimed here. For this reason, MLO asserts COUNTS II and III as alternative legal and equitable grounds for recovery of attorney's fees in the amount of $151,312.50.[7]

---

last months of MLO's representation, and demanded the advancement of substantial funds outside the purview of the Contract to continue his representation. Tatums' Brief in Response to Motion for Summary Judgment by Morris Law Office, P.C. at 1. Notwithstanding the Tatums' claims, however, it is clear from the record that relations between the parties reached the breaking point over the matter of the final bill submitted by TEE Engineering and MLO's unwillingness to distribute the $30,000 settlement solely according to the Tatums' demands. Dec. of Morris ¶ 122–134.

5. The Tatums made a "request" in "PLAINTIFF'S BILL OF COSTS" that the Colorado court assess "a total of $259,152.98 against Basin Resources, Inc. ("Basin") as part of its judgment...." This was submitted under Morris' signature but, as previously noted, at all times during the pendency of the Colorado proceedings, Jim Tatum continued as co-counsel, his name appearing as one of the "ATTORNEYS FOR THE PLAINTIFFS" on the submission to the court. Morris Decl., Exhibit 30, pp. 1 and 20. In other words, though his signature does not appear on the

Bill of Costs in the Colorado court, it was filed on behalf of both Tatums, and Jim Tatum was referenced as counsel of record. At no time before filing for summary judgment in this court have either or both the Tatums disavowed this submission or denied before the Colorado court the accuracy of the assertions they made in it.

6. There is some dispute between the parties concerning the reasonableness of the contents of the Bill of Costs as finally submitted by MLO to the Colorado court. Dec. of Morris ¶ 93–96; Dep. of Jim Tatum at 143–144; 163–195. However, it is a matter of uncontested fact in the record that, in more than eighteen months since entry of the Colorado court judgment, the Tatums have failed to file any motion to amend or to amend or withdraw the Bill of Costs on ground of fraud or inflation of claimed fees. Dec. of Morris ¶ 101; Dep. of Jim Tatum at 199–200.

7. In COUNTS II and III, MLO also demands, under ¶ 3.0 of the Contract, an award of nominal out-of-pocket costs in the amount of $1,213.44.

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any show that there is no genuine issue as to any material fact ...." FED. R. CIV. P. 56(c). In deciding summary judgment "the evidence of the nonmoving party is to be believed and all justifiable inferences must be drawn in its favor." *American Legion Post 7 v. City of Durham*, 239 F.3d 601, 605 (4th Cir.2001). A "mere scintilla" of proof, however, will not defeat entry of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The question is "not whether there is literally no evidence, but whether there is any upon which a [trier of fact] could properly" find for the nonmoving party. *Id.*[8]

## COUNT I INTERPLEADER

### *Contentions of the Parties*

*Plaintiff's Motion for Summary Judgment*

Of the $20,253.35 disputed funds remaining in the registry of the court, plaintiff contends that $19,185.00, together with pre-judgment and accrued interest, should be distributed to MLO under ¶ 4.0 of the Contract for expert witness fees incurred by TEE Engineering in support of the Tatums' claims for damages against Basin. In the alternative, MLO asks the court to distribute the funds to TEE directly. Plaintiff admits that some of the facts surrounding MLO's retention and management of TEE Engineering are in dispute,

but denies that such dispute presents any genuine issue of material fact sufficient to forestall the entry of summary judgment.

*Defendant Tatums' Response to Plaintiff's Motion for Summary Judgment*

The Tatums oppose summary judgment with respect to the balance of the interpleaded funds on two separate grounds. First, while the Tatums acknowledge ¶ 3.0 of the Contract as providing for reimbursement of expenses, they take the position in their deposition testimony that, prior to authorizing MLO to engage Don Blackburn of TEE Engineering, they expressly directed MLO to limit the cost of TEE's services to $10,000 or below. Dep of Jim Tatum at 235–243. In the alternative, the Tatums argue that, even if the court finds, as a matter of law, that such a limitation on TEE's expenses either did not exist or does not apply, the fees claimed by TEE Engineering are patently unreasonable, even disingenuous, and should not be allowed. Dep. of Jim Tatum at 157–158.

*Defendant TEE Engineering, Inc.'s Motion for Summary Judgment*

TEE Engineering, as a party defendant and a counter-plaintiff in COUNT I, merely seeks payment of its December 17, 2002 final bill for expert services. Its position is materially identical to that taken by MLO, and MLO does not oppose TEE's counterclaim seeking the entry of an order distributing $19,185.00, together with pre-judgment and accrued interest, directly to TEE for expert fees incurred in support of the Tatums' civil damage action.[9]

---

8. This case is set to be tried before the court without a jury. Thus, the presiding court also will be trier of fact.

9. The Tatums have not filed a counterclaim against any party in this case, and the time for permitting such long since has passed since discovery has closed and the parties are before the court on summary judgment. Instead, they simply oppose the distribution of the funds suggested by MLO and TEE.

*Findings, Conclusions, and Recommendations of Law*

*Plaintiff's Motion for Summary Judgment*

1. *The $10,000 Limitation*

The Tatums have acknowledged that, under ¶ 3.0 of the Contract, they were obligated to reimburse MLO for all out-of-pocket expenses within thirty (30) days of receiving MLO's bill. Moreover, the parties agree that, in August of 2002, Morris sought and received permission from the Tatums to engage Don Blackburn of TEE Engineering as an expert in the Colorado damage case. Morris Decl. ¶ 112; Dep. of Ann Tatum at 47. The questions presented relate to whether there are any genuine issues of material fact concerning the existence of the purported $10,000 limitation on the Tatums' duty to reimburse TEE's fees and the extent to which such a limitation, if legitimate, precludes the distribution of fees claimed in this case out of the funds interpleaded into the registry of the court.

Viewed in isolation, the Tatums' deposition testimony about their actions and instructions prior to the engagement of TEE, coupled with Morris' denial thereof, may be viewed by some courts as presenting genuine issues of material fact sufficient to overcome summary judgment. At first blush, the posturing of the parties appears to constitute a classic "He said, she said" scenario, one whose resolution ordinarily would be committed to the trier of fact, notwithstanding evidence from MLO that the notion of a $10,000 expense ceiling was recently created by the Tatums out of whole cloth to serve as a defense in this case. *Anderson v. Liberty Lobby*, 477 U.S. at 255, 106 S.Ct. 2505; *Hunt v. Cromartie*, 526 U.S. 541, 550–555, 119 S.Ct. 1545, 143 L.Ed.2d 731 (1999). Notwithstanding these competing views, it is the obligation of the court on summary judgment to weigh all the relevant testimony presented in the context of the entire record before the court. When placed in such a context, the Tatum's conduct will be seen to speak louder and more authoritatively than their deposition testimony in this case.

■■ In Virginia, it is axiomatic that "[a] principal is bound by his agent's previously unauthorized act if he ratifies the act by accepting its benefits with full knowledge of the relevant facts ... or, if upon learning of the act, he fails promptly to disavow it." *Kilby v. Pickurel*, 240 Va. 271, 275, 396 S.E.2d 666, 668–669 (1990). Even if the Tatums did place a limit on TEE's fees at $10,000, they ratified MLO's actions in five different ways, four of which led to additional expert expenses by TEE. First, after the Tatums purportedly established the $10,000 limitation, they knowingly directed MLO to pay TEE for work billed in three installments totaling $11,838.00. Dep. of Jim Tatum at 269–271 and Exhibit 59. Second, after MLO sent those invoices to the Tatums claiming reimbursement for TEE Engineering's services in excess of the alleged $10,000 ceiling, the Tatums specifically authorized Morris to participate in the taking of Don Blackburn's deposition. *Id.* at 245–246. Third, after receiving those invoices, Jim and Ann Tatum collaborated to prepare a list of expert witnesses for trial, which included Blackburn of TEE Engineering. *Id.* at 144, 246–249 and Exhibits 40 and 44. Fourth, and once again after receiving the invoices from MLO, the Tatums did not voice any objection or concern for their fisc when Morris called Blackburn to testify at trial. *Id.* at 257. Fifth and finally, after the Colorado trial court entered judgment in their favor in December of 2002 and after both Tatums had reviewed the pleading, MLO, with Jim Tatum listed as counsel of record, filed a Bill of Costs that

conspicuously included the *full fee* claimed by TEE Engineering.

The Tatums offer in their discovery that, upon review of MLO's proposed Bill of Costs prior to its filing, they had objections to its contents because they believed, *inter alia*, that the calculation of MLO's fees and costs was inherently fraudulent. *Id.* at 191–203. When asked to explain why the original, unmodified Bill of Costs remains outstanding before the Colorado court, Jim Tatum testified to the effect that he believes he and his wife have been precluded from taking action to correct the alleged fraudulent Bill of Costs because the trial court has entered a stay pending appeal of the judgment against Basin.

This explanation simply stretches the undersigned's credulity and, as a matter of law, is not acceptable under the circumstances of this case. No reasonable trier of fact could find that Jim Tatum, a licensed Colorado lawyer listed as counsel of record on a pleading he had reviewed but now says he found to be legally unsupportable,[10] excessive, or fraudulent, would do nothing to forestall or prevent its filing in the first instance, or to amend, modify, or withdraw the Bill of Costs from the court's consideration in the *thirteen months prior* to the date the stay was issued.[11] In addition to falling short of what is required of Jim Tatum as an attorney, the Tatums' conduct falls far short of what is required

of a principal who possesses knowledge of an agent's purported unauthorized action to promptly disavow it. In fact, their conduct demonstrates a form of intentional acquiescence which, for the Tatums, keeps in play the best of both worlds, namely the prospect of recovering MLO's full fees and litigation costs in the Colorado case and the opportunity in this action to be excused from paying MLO what is due. At best, the Tatums' conduct before the court constitutes, as a matter of law, ratification of MLO's submission. At worst, Jim Tatum's conduct, according to any standard, constitutes questionable practice by a lawyer before a tribunal.[12]

The ramifications of all this extend well beyond the realm of agency. According to Jim Tatum's own testimony, a decision by the Colorado trial court on the pending Bill of Costs, in its original form, could issue at any time, even as this Report is being prepared. Moreover, no one disputes that the Tatums, if the $622,000 judgment is upheld on appeal, would be entitled to reimbursement of costs and attorneys' fees under Colorado law. The undersigned cannot ignore, and recommends that the presiding court also decline to ignore, the fact that, in the Colorado court where Jim Tatum continues to participate as counsel of record, not merely local counsel, the Bill of Costs sets forth affirmative representations relating to the authenticity and accu-

---

10. See Dep. of Jim Tatum at 70–80.

11. Under FED. R. EVID. 201(b), the undersigned takes judicial notice of the docket sheet from the Colorado court in the case styled *Jim and Ann Tatum v. Basin Resources, Inc.*, 2001CV000026, which shows, as a matter of public record, that the Bill of Costs was filed on December 31, 2002, that Basin appealed the judgment on April 17, 2003, that the trial record was certified to the Colorado Court of Appeals on December 9, 2004, that a hearing on the original Bill of Costs was nevertheless scheduled for February 10, 2004 prior to which Basin Resources filed its objec-

tions, and that only on February 9, 2004 did the trial court enter a stay in the action pending its appeal. Thus, more than thirteen months passed between the filing of the Bill of Costs and the entry of the stay that Jim Tatum now asserts precluded him from taking action to correct the purportedly fraudulent Bill.

12. It is not disputed in this case that Ann Tatum also has filed at least two affidavits in support of the Colorado Bill of Costs, the latter of which has been offered as an exhibit in this action. Morris Decl., Exh. 31(J).

racy of MLO's fees and costs which, only now and before this court, the Tatums challenge as fraudulent.

It is not a light matter for a party, let alone a licensed attorney, to advance inconsistent, almost mutually exclusive, positions before two tribunals of competent jurisdiction. In fact, had the Colorado court acted on the Bill of Costs without delay, the doctrine of judicial estoppel would bar the Tatums from suggesting to this court that the Bill contains errors, much less was fraudulent. *Lowery v. Stovall,* 92 F.3d 219, 223 (4th Cir.1996). In order for a court in the Fourth Circuit to impose judicial estoppel, the record must demonstrate that: a) the party against whom the doctrine is applied has taken a position in the instant case that is inconsistent with a stance taken in prior litigation; b) the other court accepted the prior stance; and c) the party to be estopped intentionally misled the tribunal to gain an unfair advantage. *Id.* at 224. Here, it is undeniable that the Tatums have taken inconsistent positions in two different courts of competent jurisdiction. Moreover, there is enough evidence in the record to conclude, as a matter of law, that they have intentionally misled the Colorado court by allowing the Bill of Costs to be filed in the first instance and, then, by failing to correct what they claim to be a fraudulent Bill of Costs. The only element missing is that the Colorado court has yet make a decision on the Bill.

The Tatums would have this court make a great deal of hay out of the fact that the stay entered by the Colorado court obviated their obligation to move that court to correct the Bill. Such a position ignores two important facts. First, prior to the entry of the stay, Basin was called upon to respond to the Bill of Costs in its unaltered state, and it responded with objections only to a portion of the expenses paid to TEE, *not* to the reasonableness of TEE's expert fees or MLO's attorney's fees. Morris Decl., Exhibit 35. Second, it is an established fact, which the undersigned judicially notices, that the stay was not entered in the Colorado proceedings until the early part of 2004, over a year after the Bill of Costs was filed and well after MLO was terminated by the Tatums. In the undersigned's view, the entry of the stay by the Colorado court on February 9, 2004 cannot excuse the Tatums' silence in the thirteen months prior to that date, since (a) the Tatums had ample time to inform the Colorado court of inaccuracies in the Bill, (b) the Tatums led Basin to assume their good faith in presenting the Bill and to expend time and energy to oppose it, and (c) at any time during those thirteen months, the Colorado court could have acted on the Bill as originally drafted which would have barred the Tatums from attempting to challenge its veracity in this court.

While the Tatums may escape the application of judicial estoppel as the result of the fortuity of circumstances, they should not be permitted to escape the consequences of their conduct, which certainly speaks louder than the conclusory words they offer in their testimony in this court about the propriety of the Bill of Costs. Clearly, "[t]he purpose of [judicial estoppel] is to prevent a party from playing fast and loose with courts of competent jurisdiction." *Id.* By the same token, summary judgment exposes the genuineness of material facts, and the undersigned is of the view that a reasonable court trying the facts of this case would conclude either that the limitation was waived or that the assertions of fraud made by the Tatums are of recent fabrication designed to avoid the consequences of MLO's claims in this case. The undersigned, therefore, RECOMMENDS that the presiding District Court likewise so conclude.

### 2. *The Alleged Unreasonableness of TEE Engineering's Fees*

■ The Tatums also challenge the reasonableness of TEE Engineering's fees, and believe this is an issue for trial. Their assertion of unreasonableness is not merely that both TEE's rate of compensation and the amount of time spent are unreasonable, but that Blackburn of TEE Engineering *intentionally* padded his catalogue of fees to defraud defendants, which activity was *suborned* by Morris. Dep. of Jim Tatum at 151–162. Once again, the only "proof" offered by the Tatums for either of these "contentions" is their own testimony, which they believe is sufficient to create genuine issues of material fact. *Id.* at 159–160. The undersigned disagrees for the following reasons.

Jim Tatum's assertions here rest solely upon his own understanding of hydrological engineering and geology. Dep. of Jim Tatum at 143–157. However wise Tatum is in his own eyes, and despite his own self-profession of expertise, he is not an expert in either field. Whatever his views are on the specific subjects, they are so influenced by his personal stake in the outcome of this case, and thus so self-serving in nature, as to warrant their exclusion by the court on the ultimate reasonableness of TEE's fees. This is particularly true where, as here, no other evidence corroborates his views and Carl Gerity, a registered professional engineer in the State of Colorado who was retained as an expert by the Tatums to provide evidence in the prosecution of their civil action against Basin, has opined that the fees charged by Black-

burn and TEE Engineering were "legitimate and reasonable for the services he [Blackburn] had performed." Carl Gerity Decl. ¶ 5. To put it another way, the Tatums' self-serving lay opinions, as a matter of law, cannot stand to defeat TEE's claims in this case, which not only have been made under oath by a qualified expert but also are corroborated by another expert whom the Tatums engaged to assist them in the prosecution of the Colorado action against Basin.

For these reasons, the undersigned, therefore, RECOMMENDS that an order enter GRANTING the motions for summary judgment filed by MLO and TEE Engineering with respect to the COUNT I and DIRECTING the Clerk forthwith to distribute $19,185.00 of the $20,253.35 now held in the Court's registry to TEE Engineering together with a *pro rata* portion of the net accrued interest. For the reasons set forth below, the undersigned RECOMMENDS that the balance of $1,068.35 held in the registry of the court, together with a *pro rata* portion of the net accrued interest, be distributed to MLO under ¶ 3.0 of the Contract.[13] The undersigned further RECOMMENDS that the presiding District Judge exercise his discretion and award pre-judgment interest to run from a date selected by the court until the date of the court's distribution order, as accounted for by the parties under ¶ 3.0 of the Contract. Finally, the undersigned correspondingly RECOMMENDS that the Tatums' motion for judgment on the pleadings / motion for summary judgment on COUNT I, the interpleader, be DENIED.

---

**13.** The undersigned recognizes that MLO seeks distribution of the remainder of the interpleaded funds to satisfy a portion of out-of-pocket expenses claimed due under ¶ 3.0 of the Contract. As will be stated below in ad-

dressing COUNTS II and III, MLO should be permitted to recover the expenses to which it is entitled with partial payment to be made out of the funds held in the registry of the court under COUNT I.

## COUNT II THE BREACH OF CONTRACT/ COUNT III *QUANTUM MERUIT*

### *Contentions of the Parties*

*Plaintiff's Motion for Summary Judgment*

With respect to the claim set forth in COUNT II alleging breach of contract, MLO simply points to ¶ 2.1(b) of the Contract, the so-called "conversion clause," as the contractual basis for relief where the clients have exercised their right of termination under ¶ 4.0. Specifically, MLO contends that, when the Tatums exercised their right to terminate MLO's employment "at any time, for any reason or no reason," as provided in ¶ 4.0, they became obligated, without qualification or condition, to reimburse MLO for services it had performed for them in the Colorado civil damage action up to the point of termination at a rate of $250 per hour for Morris and $50.00 per hour for paralegal assistance. Again, MLO claims the Tatums owe him a total of $151,312.50.

The Tatums did not file a counterclaim alleging any breach of contract by MLO. Instead, and citing *Heinzman v. Fine, Fine, Legum, & Fine,* 217 Va. 958, 234 S.E.2d 282 (1977) as their authority, the Tatums oppose plaintiff's claim for contractual attorney's fees as set forth in COUNT II, first on the ground that a conversion clause, like ¶ 2.1(b), is unenforceable as a matter of law in Virginia. Second, the Tatums assert that ¶ 2.1(b) violates ethical rules governing the practice of law in both Virginia and Colorado and should not be enforced by this court. Third, the Tatums offer that, while they believe they are entitled to judgment as a matter of law, at the very least, there are genuine issues of material fact as to whether MLO was discharged for cause, which, if proved, would prevent MLO from recovering under the Contract. As part of their "discharge for cause" defense, the Tatums contend that Morris breached either the explicit or implied terms of the Contract prior to his discharge and prior to any alleged breach by them, such that MLO cannot now recover on any claim for fees under ¶ 2.1(b).

The Tatums similarly have asserted a variety of defenses to COUNT III, MLO's alternative claim for fees and expenses based on *quantum meruit.* First, they contend that *quantum meruit* relief is not available to MLO because the underlying contractual basis for the relationship between the parties either is void as against public policy or otherwise is not legally enforceable, or both. Second, they assert that COUNT III is not yet ripe because the contingency upon which MLO was to receive fees in the first instance, namely a successful prosecution of the Tatum's Colorado damage action, has not yet occurred, since the judgment of the trial court in favor of the Tatums is currently on appeal. Third, the Tatums argue that a recovery of attorney's fees in *quantum meruit* is barred when, as here, an attorney is terminated for cause. They contend that, on this point, sufficient evidence of cause has been presented to create a genuine issue of material fact for a trier of fact to resolve.

As to COUNT II, MLO counters first with the assertion that ¶ 2.1(b) of the Contract was the product of specific and substantial negotiations between the Tatums and Walt Morris of MLO. Second, MLO suggests that its contractual relationship with the Tatums was as much between itself and Jim Tatum, the licensed attorney/co-counsel, and Ann Tatum, his experienced paralegal, as it was between and MLO and two individual clients who did not possess such licensure and experience. Thus, MLO offers that the Contract was executed between parties of equal station and legal sophistication, such that the

court may fairly conclude that both sides possessed equal bargaining power and that the Contract was negotiated at arms length. Accordingly, Morris takes the position that this court should find, as a matter of law, that the Tatums fully comprehended the substance and legal consequences of the terms finalized upon signing the Contract and comprehended the potential of their liability under ¶ 2.1(b) in the event action was taken by them to terminate his services before final judgement entered *irrespective of cause.* Third, MLO offers that there is no dispute in the evidence, and that the evidence actually confirms, the Tatums intended to abide by all terms of the Contract, including ¶ 2.1(b), at the time it was executed. MLO asks the court to hold the Tatums to their agreement as written and executed by them. Fourth and finally, MLO offers that the evidence is overwhelming and undisputed that the Tatums were and have maintained the financial capacity to honor any claim by MLO for attorney's fees under ¶ 2.1(b) in the event MLO was terminated before the conclusion of the case, irrespective and independent of whether they prevail in their damage action against Basin. In short, MLO argues that evidence in this case demonstrates, as a matter of law, that the Tatums entered into the Contract with sufficient legal acumen and financial ability to understand and undertake the responsibilities entailed by an early termination of MLO's representation under ¶ 2.1(b), with or without cause, and that the court should hold them to their bargained-for promise to pay MLO for the time it spent and the expenses it had incurred up to the point when the Tatums exercised their right under ¶ 4.0 of the Contract to terminate MLO.

In the event the court determines that MLO cannot recover under the terms of the Contract, MLO also takes issue with the Tatums' defenses to plaintiff's alternative claim under Count II for *quantum meruit* relief. MLO offers that, notwithstanding a determination that ¶ 2.1(b) is legally or ethically unenforceable, it would be entitled to recover the value of its services rendered in the amount claimed under the doctrine of *quantum meruit.* In MLO's view, *Heinzman* should not be read to suggest that *quantum meruit* fees are to be calculated on the basis of the client's subjective belief regarding the value of his attorney's services, offered here by the Tatums. Instead, MLO contends that *quantum meruit* fees are to be calculated according to the reasonable, objective value of services rendered. Therefore, MLO asks the court simply to apply the *quantum meruit* calculation established long ago in *County of Campbell v. Howard,* 133 Va. 19, 51, 112 S.E. 876 (1922) and multiply the reasonable hourly rate of $250 per hour for counsel and $50 per hour for paralegal services by the reasonable number of hours spent in prosecuting the Tatums' civil damage action to arrive at a total fee which will reasonably compensate MLO for its labor in representing the Tatums.[14]

Finally, and essentially to flesh out the full context of the parties' dealings, MLO points to the undeniable fact that the Tatums were in breach of ¶ 3.0 of the Con-

---

**14.** Though the term was not in vogue when the Virginia Supreme Court decided *County of Campbell,* this methodology later became known as the "lodestar" method of calculating attorneys fees. *See Hensley v. Eckerhart,* 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983); *Blum v. Stenson,* 465 U.S. 886, 898–99, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984); *Pennsylvania v. Delaware Valley Citizens' Council,* 483 U.S. 711, 107 S.Ct. 3078, 97 L.Ed.2d 585 (1987); *Craig v. Secretary, Dept. of Health and Human Services,* 864 F.2d 324 (4th Cir.1989), *rev'd on other grounds, Gisbrecht v. Barnhart,* 534 U.S. 1125, 122 S.Ct. 1061, 151 L.Ed.2d 966 (2002).

tract before termination when they failed to timely reimburse $1,213.44 of additional out-of-pocket expenses incurred by MLO. Plaintiff believes the Tatums have not offered any viable defense for this failure to pay expenses, and it asks the court to include the above sum along attorney's fees in a final judgment in its favor, whether under the Contract or on the basis of *quantum meruit*.

*The Tatums' Motion for Judgment on the Pleadings, or, in the Alternative, Motion for Summary Judgment*

In support of their motion for summary judgment on the contract and *quantum meruit* claims, the Tatums present qualitatively identical arguments, albeit in different terminology, to those offered in opposition to plaintiff's motion for summary judgment. They facially challenge the validity of the conversion clause in reliance on *Heinzman*, as well as its enforceability in reliance on Colorado and Virginia ethical rules, and they reassert that MLO first breached the terms of the contract, which they contend entitles them to judgment as a matter of law under *Hurley v. Bennett*, 163 Va. 241, 176 S.E. 171 (1934).[15]

**Findings, Conclusions, and Recommendations of Law**

Distilled, COUNT II, as presented by the parties at oral argument before the undersigned, frames three questions, namely: 1) whether ¶ 2.1(b) of the Contract, the conversion clause, is enforceable under Virginia law as interpreted by the Virginia Supreme Court in *Heinzman;* 2) whether ¶ 2.1(b) is enforceable in view of

public policy expressed in the applicable ethics rules of Virginia and Colorado; and 3) if neither *Heinzman* nor the ethics rules of Virginia and Colorado preclude the enforceability of the conversion clause, whether MLO committed a prior breach of the Contract thus barring it from recovering fees under the conversion clause.[16] In the event the court determines that MLO cannot recover under COUNT II, the contract claim, then COUNT III, alternatively presents the question whether MLO is due reasonable fees for legal services rendered to the Tatums on the basis of *quantum meruit*.

*COUNT II: Breach of Contract*

1. *Conversion Clause and the Heinzman Decision*

The Virginia Supreme Court's closest brush with the issues raised in COUNT II of this action came in *Heinzman*, where the court was presented with the question of whether an attorney terminated by his client early in representation process could recover contingent fees under his original contingent fee contract in light of a settlement eventually negotiated by a successor attorney. The court held that exposing a client to liability for two contingent fees, one to the original attorney and another to the successor, violated the unconditional right of a client to terminate an attorney's representation. Nevertheless, the court permitted the original attorney to recover fees on the basis of *quantum meruit* for the services performed on behalf of the client prior to termination. *Heinzman*, 217 Va. at 964, 234 S.E.2d 282. The Ta-

---

**15.** The Tatums initially contended that MLO's arrangement with them, reached after execution of the Contract and calling for MLO to represent them on an hourly fee basis in the administrative portion of the Colorado litigation, constituted an oral modification of an existing contract which was unsupported by consideration. That defense has been abandoned and withdrawn.

**16.** The Tatums also contend that the conversion clause constitutes an unenforceable liquidated damages provision. In the undersigned's view, however, this assertion is frivolous and has no foundation under Virginia law.

tums read *Heinzman* to render unenforceable the conversion clause found in ¶ 2.1(b) of the Contract.[17] The undersigned agrees, but not for the reasons offered by the Tatums.

■ As stated, *Heinzman* explicitly holds that a discharged attorney cannot recover a contingent fee from the client on the grounds that such an arrangement would interfere with the client's right to discharge counsel by subjecting the client to liability for two contingent fees. By the same token, the court recognized that an attorney, whose fees are contingent on an outcome in the case and who is terminated prior to the conclusion of the case, ordinarily should be compensated for the time and effort *already* expended for the benefit of the client, though certainly not for services yet to be performed. This is confirmed by the court's observation that, "absent overreaching on the part of the attorney, contracts for legal services are valid and when those services have been performed as contemplated in the contract, the attorney is entitled to the fee fixed in the contract ..." *Id.* at 962, 234 S.E.2d 282 (citing Virginia Code of Professional Responsibility Rule 6:II:DR 2–106(A)).[18] For this reason, the *Heinzman* court con-

sidered the discharged attorney's claim for fees earned on a *quantum meruit* basis.

■ Applying this principle here, the presiding court here should reach the conclusion that *Heinzman* would not invalidate a contractual provision converting a contingent fee to a reasonable hourly fee to the extent such a conversion clause compensates the lawyer terminated without cause for only those services *already* performed. Such a conversion clause would accomplish nothing more than to secure, albeit by contract, the right of a discharged attorney to *quantum meruit* compensation articulated in *Heinzman*. Only *Heinzman's* prohibition against "overreaching on the part of the attorney" in the negotiation of the clause would limit such a contract's legal enforceability. Yet, as the *Heinzman* decision suggests, the question of overreaching is a mixed question of law and professional ethics. Thus, for a conversion clause to be enforceable, it must not run afoul of Virginia's *Rules of Professional Conduct* ("VRPC").[19]

### 2. Conversion Clauses and Public Policy/Ethical Implications

■ Under the *Virginia Rules of Professional Conduct* ("VRPC") an attorney's fees need only be "reasonable" and

---

17. The VSB, in Legal Ethics Opinion ("L E Op.") No. 1606, essentially adopted the *Heinzman* standard to hold, *inter alia*, that a Virginia lawyer may not recover a contingent fee under a fee agreement calling for the payment of such once the lawyer has been discharged.

18. Virginia's Code of Professional Responsibility was replaced with *Rules of Professional Conduct* which were in effect at the time the parties entered into the instant Contract.

19. The Tatums have suggested that the court certify the questions in this case to the Virginia Supreme Court before rendering an opinion on the merits. Certification "should be cautiously exercised," and, in the exercise of that caution, this court should account for the

certainty of delay, the expense to the parties, the potential for duplication of judicial resources and whether the extant decisions by the Virginia Supreme Court have provided sufficient guidance that this court may make an informed decision on the state of the applicable law of the case. *West American Ins. Co. v. Bank of Isle of Wight* 673 F.Supp. 760, 764 (E.D.Va.1987). The undersigned is of the view that the issue is not complicated, and that the extant Virginia decisional authorities, as well as the applicable ethical rules, provide sufficient guidance for this court to discern the standards which are to apply under the circumstances in this case. In other words, the undersigned believes this court can and should decide the contract questions here presented.

"adequately explained to the client ... preferably in writing, before or within a reasonable time after commencing the representation." Rule 1.5(a) and (b). A contingent fee *must* be in writing and state "the method by which the fee is determined ...." Rule 1.5(c). The undersigned can glean nothing from the VRPC which prohibits outright the enforceability of a conversion clause. Yet, the Rules surely caution an attorney caution in crafting the precise language and terms of such a clause. In the undersigned's view, beyond requiring that the attorney ensure (a) that the fee agreement is reasonable, (b) that the client has received adequate counsel regarding the fees to be charged, and (c) in the case of a contingent fee, that the agreement be reduced to writing, the Rules do not sanction a conversion clause which permits a discharged attorney to recover both hourly fees for work already performed *and* the balance of a contingent fee should the client later prevail. *See,* L E Op. No. 1606, adopting the *Heinzman* standard.

The problem with ¶ 2.1(b) of the Contract is precisely that: Its terms give MLO, upon termination, a right to *more* than equivalent of *quantum meruit* fees. Specifically, ¶ 2.1(b) provides for the payment of a "partial attorney fee" in the likeness of *quantum meruit* but then goes on to set forth that "the balance of Morris' total attorney fee shall be determined in accordance with subsection 2.0 of this contract," which is the original contingent fee provision. MLO argues that it merely seeks recovery of its hourly fees under ¶ 2.1(b), and it has no interest in enforcing the concomitant contingency fees provision. However, that concession is insufficient, as a matter of law, to salvage ¶ 2.1(b). If anything, *Heinzman* and L E Op. No. 1606 clearly proscribe contractual arrangements which allow recovery of contingent fees after an attorney is discharged by a client. Paragraph 2.1(b) provides for such a recovery and must be invalidated under Virginia law.

Moreover, the court should not attempt to salvage the valid portions of ¶ 2.1(b) at the expense of those portions which are invalid. The language of this provision is unified, clear and unambiguous. Parsing sentences, phrases and words in ¶ 2.1(b) in order to fabricate a construction which gives enforceable meaning to some at the expense of the others would destroy the express, unambiguous intent of the parties. In other words, ¶ 2.1(b) is written as a whole, and it must be interpreted as a whole. When interpreted as a whole, it seeks to achieve what the decisional and ethical authorities in Virginia prohibit and, therefore, should not be enforced.

That having been said, it is the undersigned's view that the court need not proceed further to determine whether Colorado's ethical standards should inform the court on the public policy considerations of conversion clauses, or whether any potential prior breach by MLO would preclude enforcement of ¶ 2.1(b) of the Contract. Those issues are now moot. Accordingly, it is RECOMMENDED that an order enter DENYING plaintiff's motion for summary judgment and GRANTING the defendants' motion for summary judgment in this regard.

With respect to the unpaid expenses portion of COUNT II, on the other hand, the Tatums have failed put forth any evidence which would excuse them from reimbursing MLO under ¶ 3.0 of the Contract for $145.09 in expenses remaining unpaid after accounting for the $1,068.35 awarded and to be disbursed out of the interpleaded funds held by the court. Reimbursement of these expenses does not run afoul of *Heinzman* or the VRPC, for not allowing for such reimbursement likely would give the lawyer an impermissible interest in the

outcome of the case. Accordingly, the undersigned RECOMMENDS that the presiding District Judge enter an order GRANTING plaintiff's motion for summary judgment with respect to the claim for reimbursement of expenses set forth in COUNT II, in the amount of $145.09, and correspondingly DENYING defendants' motion for summary judgment in this regard.

### Count III: Quantum Meruit

"When ... an attorney employed under a contingent fee contract is discharged without just cause and the client employs another attorney who effects a recovery, the discharged attorney is entitled to a fee based upon *quantum meruit* for services rendered prior to discharge ..." *Heinzman*, 217 Va. at 964, 234 S.E.2d 282. The Tatums challenge MLO's claim for *quantum meruit* attorney's fees on three separate grounds. First, they assert that MLO's *quantum meruit* claim is not ripe because the contingency which would trigger entitlement to attorney's fees under the Contract for Legal Services-that is, securing payment of the $622,000 damage award-has not yet occurred because the trial court's judgment is on appeal. Second, they offer that, under *Roller v. Murray*, 112 Va. 780, 72 S.E. 665 (1911), MLO's *quantum meruit* claim is barred because the underlying Contract violates public policy. Third, they contend that MLO cannot recover *quantum meruit* fees because there was just or good cause for MLO's termination. Under the authority of *Heinzman* and the applicable ethical standards, the first two contentions are

wholly without merit.[20] The third ground for opposition is a reprise of the Tatums' defense to MLO's breach of contract claim set forth in COUNT II, but articulated within an equitable framework. Since the undersigned's disposition of COUNT II did not require an analysis of the defense of MLO's prior breach, or the equitable "for cause" ideation of that defense to COUNT III, its reassertion in equitable terms deserves attention.

#### 1. Quantum Meruit and Discharge for Cause

The Tatums enumerate a host of reasons why the court should determine, as a matter of law, that their discharge of MLO was for cause, thus entitling them to summary judgment on Count III. Alternatively, they believe there are genuine issue of material fact concerning this defense which can be resolved only after a trial on the merits.

In his responses to plaintiff's interrogatories, Jim Tatum enumerated a plethora of ways in which he believes MLO breached the Contract of Legal Services prior to his termination, thus giving the Tatums' cause for termination:

"Walt Morris breached our contract by stealing $19,000 in costs and attorney's fees awarded to us by the Court. Walt Morris breached our contract by not trying the case to conclusion or finalization. Walt Morris breached our contract by trying to obligate us to pay jacked-up expert fees. Walt Morris breached our contract by not paying

---

**20.** By way of reminder, the *Heinzman* court not only settled the public policy issue at stake here, it held that *quantum meruit* fees are to be calculated according to "the reasonable value of the services rendered, not in benefit to the client, but, in themselves." 217 Va. at 964, 234 S.E.2d 282 (quoting from *County of Campbell v. Howard*, 133 Va. 19, 51, 112 S.E. 876 (1922)). Under this ratio-

nale, an award of *quantum meruit* fees should be made *independent* of any benefit to the client and according to the objective and reasonable value of MLO's services up to the point of termination essentially based on a lodestar calculus. MLO's *quantum meruit* claim, therefore, is ripe for consideration, and it is not barred on public policy grounds.

Otis Floyd. Walt Morris breached our contract by attempting to force us to pay TEE Engineering more money than we authorized him to allocate to TEE Engineering. Walt Morris breached our contract by not performing his legal services in a good and competent manner and thus requiring Jim and Ann Tatum to do much of his work."

James Eddie Tatum's Responses to the Plaintiff's Interrogatories ¶ 11. In addition, the Tatums claim that MLO "lied" to them repeatedly, acted extremely erratically in the last months of MLO's representation, and demanded advances of fees against the expected contingency fee. Tatums' Brief in Response to Motion for Summary Judgment by Morris Law Office, P.C. ("Tatums' Brief in Response") at 1. Based upon the accusations of what they believe was professional misconduct, the Tatums ask the court to determine as a matter of law that their termination of MLO was "for cause."

██ In adjudicating the Tatums' defense, the court must answer two key questions: (a) whether the standard to determine "for cause" is subjective or objective, and (b) if the standard is objective, whether the Tatums' evidence meets the standard, as a matter of law, or instead produces genuine issues of material fact for resolution at trial. There can be no dispute that, under Virginia law, a client has a right to discharge an attorney for any reason or no reason at all. This principle is built into the fabric of Rule 1.16 of the VRPC, and it was directly expressed in *Heinzman* when the court observed that "[n]o condition is imposed upon the client's right to discharge his lawyer." 217 Va. 958, 963, 234 S.E.2d 282.[21] The right to terminate certainly permits a client to exercise his/her subjective beliefs or desires about the attorney's conduct in making a decision about termination. If a client loses faith in the attorney for any reason, the lawyer must honor the client's wish to cease representation, regardless of whether the client's loss of faith can be objectively justified.

On the other hand, the undersigned is of the view that the "for cause" defense to a claim for *quantum meruit* relief *requires* inquiry into whether the client's termination of counsel can be justified objectively. The mere fact that a client possesses the absolute right to terminate an attorney for any reason or no reason based on the client's subjective desires does not also give the client the authority to deprive the discharged attorney of reasonable fees for the effort expended on behalf of the client up to the point of discharge. The lawyer very well may have discharged all obligations to the client quite properly, even though the client personally did not see it that way. Moreover, an objective inquiry into allegations of cause, the undersigned believes, should be one in which, at a minimum, requires a reasonable trier of fact to assess whether, under the circumstances, the lawyer acted reasonably. Should the inquiry go further to follow the pattern established in professional negligence cases, the court would then need to probe whether the lawyer's representation fell below the appropriate standard of care for counsel in the same or similar field of practice, which ordinarily requires the introduction of expert testimony. *See Seaward International, Inc. v. Price Waterhouse*, 239 Va. 585, 591–592, 391 S.E.2d 283 (1990).

██ At this point, it is important to recall that the essential purpose of MLO's representation was to obtain a judgment

---

**21.** Rule 1.16(a)(3) of the VRPC is the current, essentially verbatim, iteration of DR 2–108 whose predecessor was Rule 6:II:DR 2–110 of the Code of Professional Responsibility which was before the court in *Heinzman*.

against Basin Resources that would fully and fairly compensate the Tatums for damage Basin's activities caused to their ranch home. The undisputed evidence is that, in expending over five hundred hours in furtherance of that litigation, Morris advanced that essential purpose. Based on the evidence Morris developed at trial, including that of the very expert the Tatums challenge in this case, the Colorado court entered a judgment in favor of the Tatums for the *entire amount* they sought in their Complaint. One could not conclude from the results obtained that MLO's conduct was objectively unreasonable, but results are not the litmus test for the objective reasonableness of a lawyer's performance. There is a more critical question to ask. If the Tatums indeed had serious relationship-breaking complaints about Morris which went to the heart of his ability to perform services to them in a reasonable way, or even if they entertained such complaints merely about Morris' methodology *before* trial, why did they wait to discharge Morris "for cause" until *after* he secured for them a fully favorable damage award against Basin? In the undersigned's view, the Tatums' inaction at best represents a serious case of "bet-hedging," by which they aimed to reap the benefits of Morris's services without shouldering any responsibility for the expense he incurred in representing them. At worst, their tactics expose a true lack of objective evidence to support any current "for cause" defense, and demonstrate the hollowness of their complaints about the reasonableness of Morris' services in this case. The court ought not sanction either, for both represent an effort by disgruntled clients to deprive a lawyer of the value of the time spent securing an overwhelming victory for them at trial.

Construing the record evidence in a light most favorable to the Tatums on MLO's motion for summary judgment and in a light most favorable to MLO on the Tatums' cross motion for summary judgment, the undersigned concludes that none of the Tatums' reasons, singularly or in combination, supports the "for cause" defense to MLO's claim for *quantum meruit* relief. The undersigned cannot help but see on this record that all of the Tatums' criticisms fall far short of being material to the performance of the material purpose of the Contract. Furthermore, the Tatums have presented no evidence to show they were harmed or even exposed to harm by Morris' alleged failures. Nor could they, since they achieved essentially an all-out victory against Basin at trial.[22]

In the end, the undersigned is of the view that Tatums' criticisms amount to nothing more that, criticisms informed only by their own subjective views or personal opinions, and characterized by conclusory statements such as Morris "lied" to them "repeatedly" or "acted extremely erratically in the last months of [his] representation." Much the same can be said about MLO's alleged impropriety in billing for additional expert expenses, principally those related to TEE Engineering, though that has been covered in particularized detail under COUNT I and need not be rehearsed here. Suffice it to say that, on the record before the court, the undersigned finds, as a matter of law, that MLO's conduct in these respects was not unreasonable in the *quantum meruit* context. It certainly crossed no legal or ethical line so as to sustain any notion that MLO was discharged "for cause."

The Tatums also charge that MLO essentially was "stealing" their money by

---

**22.** Although the trial judgment is currently on appeal, MLO cannot be faulted for any reversal of that judgment, for, in discharging MLO's representation immediately after the entry of the trial judgment, the Tatums deprived it of the opportunity to assist them in protecting that judgment on appeal.

placing the settlement proceeds from the administrative proceedings in the firm's trust account, i.e. in escrow, and then by tendering them into the registry of the court under the interpleader count of the Complaint. By any measure, this is a serious charge having potential ramifications both for the party charged and the party bringing the charge. However, on the record before this court, no reasonable court trying the facts of this case could conclude that such a charge reflects adversely on MLO or Morris. Quite the opposite is true. When the undisputed facts about the manner in which Morris handled the funds bubble to the surface out of the swamp of the Tatums' accusations, the only conclusion a reasonable court, as the trier of fact, could reach is that Morris discharged his duties with respect to those funds in *the* most ethically and legally appropriate way.

At the time MLO duly received the settlement proceeds, a dispute was brewing over how the funds were to be distributed. Morris did not simply follow a course that might have seemed right in his eyes, nor was he obligated to knuckle under to demands from the client to pay out the funds a certain way when there were competing interests vying for them. Instead, Morris did what would be ethically encouraged of any lawyer in Virginia. He sought and received guidance from the VSB, and consistent with that guidance and with the VRPC, he paid the undisputed amounts, held the balance in a trust account, and then instituted proceedings to have a tribunal determine how the funds would be distributed. This deserves a commendation, not an accusation of wrongdoing, for it set an example of ethical practice which Jim Tatum, as a licensed attorney, should have recognized. In short, rather than supporting the Tatums' allegations in this respect, the evidence in the case actually exposes both the condition of their hearts

at the time and the propriety of Morris' disbursements of the funds. Again, the undersigned is of the view that, as a matter of law, MLO's conduct was not unreasonable on the evidence offered into the discovery record by the Tatums.

To the extent that a resolution of any of the alleged improprieties goes beyond the common knowledge of laymen or beyond the ethical or legal standards fixed by the VRPC and the extant decisional authorities which the court, itself, is obligated to apply in this case, it would be incumbent upon the Tatums to have adduced expert evidence that MLO deviated from the appropriate professional standards *and* to establish that such deviation was the proximate cause of any damage claimed by them. *Seaward International,* 239 Va. 585, 592, 391 S.E.2d 283. No such evidence has been produced, essentially relegating the Tatums' evidence to that of *ipse dixit,* or "It is so because I/we say it is so." That is not enough to stand against MLO's motion for summary judgment, to prevail on their motion for summary judgment, or to require a trial on the merits of their "for cause" defense to plaintiff's claim for *quantum meruit* relief.

Another criticism of MLO's conduct by the Tatums involves the post-judgment proceedings before the Colorado court in which the Bill of Costs was presented after MLO procured the results favorable to the Tatums. The undersigned already has addressed this matter in the context of COUNT I and simply readopts those findings and conclusions here. In short, the undersigned finds that no reasonable court trying the facts of this case could conclude from the discovery evidence that MLO's conduct relating to the Bill of Costs in which the Tatums sought prevailing party attorney's fees and costs was unreasonable or afforded "cause" for MLO's discharge.

For all these reasons, it is RECOMMENDED that plaintiff's motion for sum-

mary judgment on Count III, for *quantum meruit* relief be GRANTED, and that the defendant's motion for summary judgment on this count be DENIED.

### 2. Calculation of Attorney's Fees under Quantum Meruit

 The remaining question relates only to determining the amount of the fee to which MLO would be entitled under COUNT III of the Complaint. According to both *Heinzman* and *County of Campbell v. Howard*, 133 Va. 19, 112 S.E. 876 (1922), the calculus is simple. In determining:

"the reasonable services rendered, not in benefit to the client, but, in themselves ... the circumstances to be considered ... are the amount and character of the services rendered, the responsibility imposed; the labor, time, and trouble involved; the character and importance of the matter in which the services are rendered; the amount of the money or the value of the property to be affected; the professional skill and experience called for; the character and standing in their profession of the attorneys; and whether or not the fee is absolute or contingent, it being a recognized rule that an attorney may properly charge a much larger fee where it is to be contingent than where it is not so. The result secured by the services of the attorney may likewise be considered; but merely as bearing upon the consideration of the efficiency with which they were rendered, and, in that way, upon their value on a quantum meruit, not from the standpoint of their value to the client."

*County of Campbell*, 133 Va. at 51, 112 S.E. 876.

 As alluded to above, *County of Campbell* essentially provides for what has become known as a "lodestar" fee which has been derived over the years from fee shifting statutes such as the Surface Mining Control and Reclamation Act ("SMCRA"), 30 U.S.C. §§ 1201–1328, under which MLO instituted the Tatums' civil action against Basin in the Colorado court. In its simplest form, a lodestar fee usually equals "the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). The primary difference between the lodestar calculation in some jurisdictions, including the federal courts, and the *quantum meruit* calculation set forth in the Virginia decisions appears to be in the area of the relative importance placed upon the result achieved by the attorney. It is clear that, in Virginia, the focus is on the objective value of the services rendered by the terminated attorney, not the value of the benefit conferred.

The Tatums never have challenged the reasonableness of MLO's hourly rate of $250.00, or the rate of $50.00 per hour for paralegal assistance, and, frankly, the undersigned is of the view that, as a matter of law, such hourly rates are reasonable, particularly given the ample evidence in the record of Morris' expertise and experience in the field of SMCRA litigation.[23] Jim Tatum has voiced his views about the reasonableness of the time spent by MLO

---

**23.** The undersigned's decision with respect to the reasonableness of MLO's hourly rate of $250 per hour is buttressed both by the fact that the Tatums paid MLO that precise rate for his work in prosecuting the administrative phases of the Colorado litigation and by the consonant opinion of the Colorado court in assessing the Tatums' costs against Basin in the administrative litigation. See Plaintiff's Memorandum in Support of Summary Judgment, Exhibit 27. Moreover, the same rate was submitted by MLO and Jim Tatum, as co-counsel of record, in the bill of costs currently before the Colorado District Court.

on certain aspects of the case when presenting his deposition testimony in this court about the Bill of Costs submitted to the Colorado court, using terms like "greedy" and "overreaching" and "far overblown" and "a bunch of baloney." Tatum Dep. at 143–146. The undersigned remains considerably disquieted by both the relative recency of these objections and the fact that Jim Tatum, as co-counsel in the Colorado proceeding, has done nothing to correct what he now claims is a fraudulent request for payment of fees and costs. The undersigned even has difficulty viewing the Tatums allegations of fraud in these proceedings as a good faith attempt to set the record straight, for the court still must confront the undisputed fact that, in the eighteen months the Bill of Costs has been pending, the Tatums have not approached the Colorado court with the same contentions. As with the Tatums' objections to TEE Engineering's claim, this court cannot invoke the doctrine of judicial estoppel to bar the Tatums' from voicing here any objections to the recitals of fees in the Colorado Bill of Costs because a decision thereon has been stayed pending Basin's appeal of the damage judgment. Nevertheless, in considering the motions for summary judgment on this record, the court is not bound to accord, and should not grant, any weight to the Tatums' testimony here because it is belied by their undisputed conduct before the Colorado court. Their action or inaction before that court should speak more authoritatively than their words before this court.

For the above reasons, the undersigned hereby RECOMMENDS that the presiding District Judge enter an order GRANTING plaintiff's motion for summary judgment on its *quantum meruit* claim set forth in COUNT III of the Complaint; DENYING defendants' motion for judgment on the pleadings; and entering judgment in favor of MLO and against the Tatums in the amount $151,312.50 along with any prejudgment interest at a rate the court may determine commencing with the date of termination until the date judgment in this court enters.[24]

## SUMMARY OF RECOMMENDATIONS ON ALL MOTIONS

For the foregoing reasons, the undersigned hereby RECOMMENDS that the presiding District Judge enter an order:

a) GRANTING plaintiff's motion for summary judgment and TEE Engineering's motion for summary judgment on COUNT I of the Complaint, the interpleader count, and distributing all remaining funds as recommended above;

b) DENYING, in part, plaintiff's motion for summary judgment on COUNT II of the Complaint, to the extent it seeks an award of attorney's fees for breach of ¶ 2.1(b) of the Contract, but GRANTING plaintiff's motion to the extent it seeks to recover the balance of unreimbursed expenses under ¶ 3.0 of the Contract, namely $145.09;

c) GRANTING, in part, the Tatums' motion for summary judgment on COUNT II with respect to the enforceability of ¶ 2.1(b), but DENYING the motion with respect plaintiff's claim in COUNT II for reimbursement of expenses under ¶ 3.0 of the Contract; and

d) GRANTING plaintiff's motion for summary judgment on COUNT III, the *quantum meruit* count, and ENTERING judgment as a matter of law in favor of MLO and against the Tatums in the

---

24. To the extent the presiding court declines to accept the undersigned's recommendation to enforce under COUNT II above MLO's claim to $145.09 in costs not paid out of the interpleaded funds, the undersigned RECOMMENDS that MLO be awarded such funds under COUNT III.

amount of $151,213.50 in attorney's fees along with such prejudgment interest as the court may determine, and DENYING defendants' motion for summary judgment with respect to same.

The Clerk is directed immediately to transmit the record in this case to the Hon. James H. Michael, Senior United States District Judge. Both sides are reminded that pursuant to Rule 72(b) they are entitled to note objections, if any they may have, to this Report and Recommendation within ten (10) days hereof. Any adjudication of fact or conclusion of law rendered herein by the undersigned not specifically objected to within the period prescribed by law may become conclusive upon the parties. Failure to file specific objections pursuant to 28 U.S.C. § 636(b)(1)(C) as to factual recitations or findings as well as to the conclusions reached by the undersigned may be construed by any reviewing court as a waiver of such objection.

The Clerk of the Court hereby is directed to send a certified copy of this Report and Recommendation to all counsel of record.